PATTERSON, Justice:
This is an appeal from a decree of the Chancery Court of Clarke County which confirmed title in the minerals and surface of the South One-Half of the Southeast Quarter of Section 18, Township 1 North, Range 15 East, Clarke County, in Tommie Collins and others, the complainants. The defendants, Mamie C. Oliver and 163 others, being aggrieved that their claim to title as cotenants was rejected by the chancellor, prosecute thip appeal.
The primary assignments of error are that the chancellor erred in not finding the existence of a cotenancy relationship between the parties to the suit, erred in not giving recognition to the fiduciary relationship that exists between cotenants, erred in not finding that the original entry on the land by a predecessor of the complainants was with the permission of the record owner, and erred in finding that an ouster of the cotenants had occurred. We are urged to reverse the decree of the lower court by finding á portion of the title^ to be vested in the defendants as the result of cotenancy and remand the case for an accounting.
The parties concede that the record title to the land in controversy was vested in Matt Coleman by deed of October 1, 1890. Upon this premise the appellants contend that when Matt Coleman died intestate sometime prior to 1920 all lands owned by him descended in equal parts to his widow and their twelve children as cotenants. It is then argued that since the complainants do not deny the cotenancy relationship beginning with the death of Matt Coleman, there is presented a typical cotenancy case *825 relating to the quantum of evidence necessary to establish ouster by actual notice or the equivalent thereof. While it is true that appellees admit that a cotenancy relationship came into existence among the heirs upon the death of .Matt Coleman, the admission does not foreclose the issue raised by the appellees that title to the land in controversy had vested in Richard Coleman prior to the death of Matt so that it did not descend to his heirs.
The appellees thus contend alternatively that if Matt Coleman was not so divested of title prior to his death, the exclusive and adverse use of the controverted 80 acres by Richard Coleman and his descendants subsequent to Matt’s death was the' equivalent of actual notice to the other cotenants and was sufficient in both scope and time to constitute ouster and vest title in the heirs of Richard Coleman.
The chancellor’s opinion is vague in this regard. We cannot determine from it whether his opinion confirming title in the heirs of Richard was based upon an ouster of the other cotenants subsequent to the death of Matt or whether the court found that Richard had obtained title tO' the property by adverse possession prior to his father’s demise. If the last-mentioned situation be correct, this appeal is without merit inasmuch as the appellants’ case is based upon cotenancy emanating from Matt’s death plus the assumption that the property was vested in him at that time.
The first issue to be determined is whether title had ripened in Richard prior to the death of his father. The evidence stemming from the land records of Clarke County indicates that many years ago Matt Coleman purchased three separate but contiguous tracts of land in that county. On October 7, 1889, he acquired 40 acres for the sum of $35. On October 1 of the following year he purchased 80 acres (the land in controversy) for an undisclosed sum, and on January 6, 1893, he acquired 238 acres for the sum of $525.
Four days thereafter on January 10, 1893, Matt Coleman, his wife Nancy and their two sons Abe and Richard, executed a deed of trust to a local mercantile establishment to secure the sum of $512.34. This deed of trust included the 40-acre tract purchased in 1889, the 80-acre tract purchased in 1890, as well as the 238 acres purchased on January 6, 1893. It contained the recitation, “the property is free from all encumbrances and that they, the grantors, have good right to sell and convey the same.”
The following year a similar deed of trust was executed by the same parties with an identical recitation that the grantors had good right to sell and convey the same. Like deeds of trust were executed in 1895, 1896 and 1897. The land records further disclose that from the time of acquisition of the land until it was purchased by the state at a tax sale in 1931 the property was assessed to Matt Coleman.
The testimony of the witnesses offered by the complainants, most of whom were aged residents of the area, reflects that in 1899 Richard Coleman became engaged to India Allen and in anticipation of their marriage he constructed a house upon the property now in controversy. Thereafter, in 1899 he and India were married and took up residence in the house he had constructed and used the 80 acres for their livelihood. From the time of this entry in 1899 until his death on November 7, 1939, Richard had the exclusive uninterrupted and continuous possession of the 80-acre tract.
The uncontradicted evidence is that Richard Coleman entered the property in 1899, built a house thereon, reared a family of eight children upon the premises, grew crops thereon, pastured the land, enclosed it with rail fences, cut stove wood and crossties therefrom and generally exercised every use over it to which it was susceptible. The testimony of one of the witnesses who aided Richard in the construction of his house in 1899, who helped him split rails for the fences and who was long associated with Richard and his wife, indi *826 cates that Richard selected this land for his use prior to his marriage.
The land record discloses no further deeds of trust being executed by Richard after entering this property upon either this land or the remaining portion of the entire tract which was occupied and used by Matt Coleman, his wife Nancy and their son Abe. Indeed, the testimony is that from 1899 until his father's death in 1912 Richard used the land as his own without accounting to anyone and that during this same interval Matt and Abe occupied and used the remaining portion of the lands exclusively for their benefit. It thus came about that the lands occupied by Matt and Abe were known in the community as the “Matt Coleman place” or, subsequent to Matt’s death, the “Old Coleman place” and the tract occupied by Richard from 1899 was known as the “Richard Coleman place.”
The evidence does not disclose any protest of Richard’s possession of the land by either Matt or Abe during the father’s lifetime. Thereafter, there was no protest by either Abe or the remaining heirs of Matt to the use of the property by Richard until he died in 1939. Neither was any protest voiced by the heirs of Matt Coleman to the use of the land by Richard’s heirs subsequent to his death until the discovery of oil shortly prior to the filing of this suit in October 1969.
The question presented is whether Richard, who had no deed to the property, was vested with title prior to the death of his father in 1912.
In considering the facts and circumstances relating to the entry of Richard upon the lands, it is obvious that the passage of time leaves highly improbable a determination that can be made with exactitude as to this event and its surrounding circumstances. It is equally obvious, we think, that stability of titles be maintained by the courts for the repose of society when the facts of a case permit. This thought is expressed in Tones on Evidence, Presumptions, section 74 (3d Ed. 1924), wherein it states:
It is an ancient principle of law that when a person is shown to be in the possession of property, such possession is presumed to be rightful. Potior est con-ditio possidentis. Among other grounds which have been assigned for this presumption are these: that it is in accord with the general principles of law to suppose, until the contrary is shown, that possession is lawful rather than unlawful ; that since the rightful owners of property are not likely to consent that their property remain in the continued possession of others who assert title thereto, it is a natural conclusion that possession of this character is authorized by some grant or license; and finally, as stated by Judge Story, “presumptions of this character are adopted from the general infirmity of human nature, the difficulty of preserving the muniments of title and the public policy of supporting long and uninterrupted possession.”
This theory has been expressed in Caruth v. Gillespie, 109 Miss. 679, 685, 68 So. 927, 929 (1915), wherein the Court used the following language in its discourse upon the presumption of a lost grant or gift, quoting from Stevenson’s Heirs v. McReary, 12 Smedes & M. 9, 50 (Miss.1849):
“ * * * Laws and judicial tribunals are established for defining and settling rights, so that order and tranquillity may may prevail in the community. The policy of the law favors the repose of society, and hence it makes due allowances for the frailties of human memorials, and the difficulties in establishing perpetual evidences of the transactions of men. When so long a time has elapsed that certainty in the proof of events cannot be expected, it receives as a substitute that which is less certain in order to protect apparent right. A contrary policy is not to be tolerated. It would convert the law into an engine to work incalculable mischief. Instead of giving *827 repose to society, it would be the means of promoting contention and strife which would often terminate in injustice.”
To the same effect see McCain v. Turnage, 238 Miss. 44, 46-47, 117 So.2d 454, 455 (1960), wherein we held with regard to an easement that the original use was adverse so that the statute of limitations became effective. We indulged this presumption as the result of passage of years and long use of the property in order to promote the stability of titles. We stated:
We hold that where, as in the present case, a use of the lands of another for roadway purposes has been open, visible, continuous, and unmolested since some point in time anterior to the memory of aged inhabitants of the community, such use will be presumed to have originated adversely. This is in accord with the prevailing view. * * * Any other rule than the one just stated would be calculated to stir up dissension between neighbors and disturb the repose of communities.
In reviewing Richard’s entry upon the land in 1899 with the foregoing authorities in mind, we conclude that Richard’s initial possession of the land was by color of right as the result of a parol gift from his father. We deem it illogical that he would have constructed a house, fences, and engaged in agricultural pursuits unless it was with the permission of his father. It is highly unlikely that the father would have permitted this use without accounting unless it was his purpose to give the land to his son as a marriage gift. The contrary, of course, can be argued; that is, that Richard entered the property by license of his father as a tenant at will, and assuming, but not deciding, that this is as logical as the presumption of a parol gift, nevertheless, in equity the former presumption will be indulged since this theory lends itself to the stability of titles.
In Chatman v. Carter, 209 Miss. 16, 25-26, 45 So.2d 841, 844 (1950), though the requisites were not there present for the presumption of a parol gift, the Court re-announced the general rule to be:
* * * A claim of title under a parol gift, accompanied by entry and adverse holding for 10 years, ripens into a good title. * * * But, under the present record, the proof was not sufficient to comply with these authorities. And the clearest and most satisfactory evidence is required as to the fact of gift, the identity of the land, and the exclusiveness of the possession. 28 C.J. 680. See also 38 C.J.S., Gifts, § 57, page 843.
The criterion mentioned as to the facts of a gift, that is, the clearest and most satisfactory evidence, the identity of the land and the exclusiveness of the possession, are all embodied in this record. The clearest and best evidence emerging from the now ancient entry of Richard, according to the testimony of an aged witness, was that Richard made his selection of the land and occupied it. It is identified and he and his heirs have had the exclusiveness of possession for 71 long years. In Davis v. Davis, 68 Miss. 478, 480, 10 So. 70 (1891), we held:
It is too well settled by decisions of this court, and by innumerable authorities in other states, that a claim of title under a parol gift or purchase, accompanied by entry and adverse holding, may ripen into an indefeasible title by the lapse of statutory period of limitation, to admit of present argument or contention. Magee v. Magee, 37 Miss. 138; Davis v. Bowmar, 55 Miss. 671; Niles v. Davis, 60 Miss. 750; Geohegan v. Marshall, 66 Miss. 676, 6 South.Rep. 502; Campbell v. Braden, 96 Pa.St. 388; Clark v. Gilbert, 39 Conn. 94; Steel v. Johnson, 4 Allen, 425; Outcalt v. Ludlow, 32 N.J.Law, 239; Bartlett v. Secor, 56 Wis. 520, 14 N.W.Rep. 714; Potts v. Coleman, 67 Ala. 222; Collins v. Johnson, 57 Ala. 304.* * *
The possession, continuous and exclusive use of the land by Richard subsequent to 1899 is unchallenged. Ten years there *828 after title ripened in him by adverse possession effectively divesting his father of title so that these lands did not descend to Matt’s heirs in cotenancy. The opinion of the chancellor will therefore be affirmed.
Affirmed.
GILLESPIE, C. J., and JONES, INZER and ROBERTSON, JJ., concur.